UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JOHN D. MYERS, JR.,                           )
                                              )
                    *Plaintiff*,              )
                                              )
         vs.                                  )        No. 1:20-cv-00392-JMS-DLP
                                              )
EQUIFAX INFORMATION SERVICES, LLC,            )
EXPERIAN INFORMATION SOLUTIONS, INC., and     )
TRANS UNION, LLC,                             )
                                              )
                    *Defendants*.             )

**ORDER**

Plaintiff John Myers, Jr. took out an automobile loan with Ally Financial ("Ally") and subsequently filed a Voluntary Petition for Chapter 7 Bankruptcy. During the course of the bankruptcy, he believed that he had reaffirmed the debt and continued making the monthly payments, but Ally believed that the debt had been discharged in the bankruptcy. Defendants, credit reporting agencies Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union") (collectively, "the CRAs"), all reported Mr. Myers' Ally loan as "discharged" rather than "reaffirmed." Mr. Myers initiated this litigation against the CRAs, setting forth various individual and class claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"). Mr. Myers has filed a Motion for Class Certification, [Filing No. 164], and the CRAs have filed a Motion for Summary Judgment, [Filing No. 176], both of which are ripe for the Court's decision.

1

# I.
## THE CRAs' MOTION FOR SUMMARY JUDGMENT[1]

### A.    Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

---

[1] As the Court noted in its June 7, 2022 Order, class certification issues are generally decided before summary judgment issues, but that is not always the case.  *See Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995) ("It is true that Rule 23(c)(1) of the civil rules requires certification as soon as practicable, which will usually be before the case is ripe for summary judgment.  But 'usually' is not 'always,' and 'practicable' allows for wiggle room.").  Having reviewed the parties' summary judgment briefs, the Court finds it prudent to decide the Motion for Summary Judgment first because it raises issues particular to Mr. Myers' individual claims that bear on the appropriateness of class certification.

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

B.      **Statement of Facts**[2]

1.      *The CRAs' Function*

The CRAs obtain information from subscribers (also called furnishers) and public records vendors regarding a consumer's credit data, and compile the data into a credit report.  [Filing No. 177-2 at 3; Filing No. 177-2 at 7; Filing No. 177-3 at 3-4; Filing No. 177-4 at 3.]  Furnishers are typically creditors or other entities that have a credit relationship with the consumer.  [Filing No. 177-4 at 3.]  A credit report is a report that a CRA prepares about a consumer and provides to third parties for purposes of extending credit, employment, or insurance.  [Filing No. 177-2 at 3; Filing No. 177-4 at 3.]  A consumer disclosure is a report that a CRA prepares and provides to the consumer who is the subject of the information, so that the consumer can review the accuracy of the information.  [Filing No. 177-2 at 3.]

A consumer's credit file contains tradeline information related to entities that have a credit relationship with the consumer.  [Filing No. 177-2 at 3; Filing No. 177-3 at 5.]  The CRAs also report public record information about consumers – including public record bankruptcy information – that they receive from public records vendors.  [Filing No. 177-2 at 3; Filing No. 177-3 at 5; Filing No. 177-4 at 4.]

2.      *The CRAs' Procedures Relating to Bankruptcies*

In determining whether a consumer has been a party to a bankruptcy, the CRAs receive high level information from their public records vendors, including the consumer's name, the type

---

[2] Mr. Myers objects to the Court's consideration of numerous facts that the CRAs set forth in support of their Motion for Summary Judgment.  [*See* Filing No. 219 at 6-9.]  The Court has considered Mr. Myers' objections, has declined to include certain facts, has included some facts as background information only (*e.g.*, the CRAs' reporting of Mr. Myers' Ally debt after the lawsuit was filed), and has included other facts to which Mr. Myers objects when it found those facts relevant to the Court's analysis of the issues (*e.g.*, the onboarding and vetting process CRAs use for furnishers).

of bankruptcy filed (*i.e.*, Chapter 7 or Chapter 13), the date the consumer filed the bankruptcy, and the court in which the consumer filed the bankruptcy.  [Filing No. 177-2 at 7; Filing No. 177-3 at 5; Filing No. 177-4 at 4.]  The vendors also inform the CRAs when a bankruptcy has been discharged or dismissed, but the data the vendors provide does not include information about particular tradelines.  [Filing No. 177-2 at 7.]  In order to learn that a particular account was reaffirmed[3] and not discharged in bankruptcy, the CRAs rely on data furnishers and consumers. [Filing No. 177-2 at 6; Filing No. 177-3 at 5-6; Filing No. 177-4 at 4-5; Filing No. 177-5 at 44-45; Filing No. 178-11 at 32-33; Filing No. 178-12 at 18-19; Filing No. 178-12 at 22-23.]  However, Trans Union and Experian also provide their agents with instructions related to using the Public Access to Court Electronic Records service ("PACER") to access bankruptcy records.  [*See* Filing No. 217-3; Filing No. 217-4.]

a.    Reaffirmation Information From Data Furnishers

Before the CRAs will accept information from a particular data furnisher, the furnisher goes through a vetting process.  Experian "conducts investigative activities such as inspection of the business premises, verification of business license, and conflict checks" as part of its vetting process.  [Filing No. 177-2 at 3.]  Experian's subscribers also sign a contract requiring them to take steps to ensure that they only report accurate information.  [Filing No. 177-2 at 3.]  Equifax "will provide consumer reports and accept consumer credit data only from those data furnishers Equifax has determined are reasonably reliable based upon Equifax's own investigation, the data furnisher's

---

[3] "Under the bankruptcy code, 'reaffirmation' is a process that allows the debtor in bankruptcy to keep his property in exchange for making regular monthly payments on the loan going forward…. If the debtor chooses this option, the debt is essentially omitted from the discharge of debts that the debtor normally receives in a Chapter 7 bankruptcy." *Dixon v. Green Tree Servicing, LLC,* 2015 WL 2227741, at *1 (N.D. Ind. May 11, 2015).

reputation in the community, and/or Equifax's longstanding business relationships with them," and each data furnisher signs an agreement certifying that it will comply with the requirements of the FCRA. [Filing No. 177-3 at 3-4.] Equifax does not police data furnishers to ensure that they are timely updating account information relevant to bankruptcy reporting. [Filing No. 217-2 at 16-17.] Trans Union investigates furnishers before agreeing to accept data from them, does not accept data from furnishers who it believes are unreliable, and contractually requires furnishers to only report accurate information. [Filing No. 177-4 at 3.] If at any point a CRA learns that a furnisher is not providing accurate information, it takes immediate steps to remediate, up to and including terminating its relationship with the furnisher. [Filing No. 177-5 at 34-36; Filing No. 178-11 at 20.]

Furnishers are required to report data to the CRAs pursuant to an industry-wide manual called the Credit Reporting Resource Guide ("CRRG") and in a format called Metro 2. [Filing No. 177-2 at 3; Filing No. 177-3 at 4; Filing No. 177-4 at 3.] The CRRG explains that furnishers are to report accounts that are reaffirmed, included in, or discharged in bankruptcy using Consumer Information Indicators ("CIIs"). [Filing No. 177-2 at 4; Filing No. 177-4 at 4.] If an account is included in a consumer's Chapter 7 bankruptcy petition, the data furnisher uses a CII of "A" and a CII of "E" to indicate that the debt was included in the bankruptcy and has been discharged. [Filing No. 177-2 at 4; Filing No. 177-3 at 5-6; Filing No. 177-4 at 4.] If an account was reaffirmed, the data furnisher uses a CII of "R." [Filing No. 177-2 at 4-5; Filing No. 177-3 at 7; Filing No. 177-4 at 4.] If a data furnisher updates a report to reflect a CII of "R" where the furnisher previously

reported a CII of "A" or "E," the CRA will update the account to reflect that status.  [Filing No. 177-2 at 4-5; Filing No. 177-3 at 8; Filing No. 177-4 at 6.][4]

b.    Reaffirmation Information From Consumers

The CRAs will only receive a copy of a reaffirmation agreement if it is provided by a consumer.  [Filing No. 177-2 at 5; Filing No. 177-4 at 4-5; Filing No. 178-12 at 18.]  If an account is being reported as discharged in bankruptcy and the consumer provides a copy of the reaffirmation agreement to the CRAs, the CRAs will either automatically update the tradeline to report the debt as reaffirmed in bankruptcy (regardless of what the data furnisher is reporting), or reinvestigate the status of the debt with the furnisher.  [Filing No. 177-2 at 4; Filing No. 177-3 at 6; Filing No. 177-4 at 4-5; Filing No. 178-12 at 27.]  If a consumer provides inadequate documents to a CRA (or does not provide any documents) to support their claim that an account should be reported as reaffirmed in bankruptcy, the CRA will thoroughly review the dispute and contact the data furnisher to verify the accuracy of its reporting through the Automated Consumer Dispute Verification ("ACDV") process.  [Filing No. 177-3 at 6; Filing No. 177-4 at 4-5; Filing No. 178-

---

[4] Mr. Myers states in his "Statement of Material Facts in Dispute" that "[r]eaffirmation information, however, has never been sought by the CRAs from the bankruptcy courts or from their public record vendors," citing to deposition testimony from the CRAs' various representatives.  But the cited record evidence is either inconclusive or does not stand for that proposition.  For example, Experian representative Kimberly Cave testified that she did not know if a vendor has the ability to provide Experian with reaffirmation information.  [Filing No. 217-5 at 4.]  James Garst of Trans Union testified generally regarding the information its vendor, LCI, provides to Trans Union relating to bankruptcies and then stated that he did not know if Trans Union could request more information from LCI and that he did not know if Trans Union had ever asked LCI for more information related to a reaffirmed account.  [Filing No. 217-7 at 4-5.]  The cited portion of Lynn Prindes' deposition transcript includes Ms. Prindes being asked whether she knew if Trans Union's vendor provides Trans Union with information regarding debts reaffirmed in bankruptcy, her counsel objecting, and then Ms. Prindes testifying that she did not know the answer.  [Filing No. 217-6 at 4.]  And Mr. Myers relies on information from pages 11-13 of Lisa Willis's deposition transcript, but did not submit pages 11 or 12 with his exhibit.  [See Filing No. 217-2.]  Mr. Myers' counsel is cautioned that citations to the record must properly support the proposition for which they are cited.

12 at 27.]  If the data furnisher then advises the CRA that the account should be reported as reaffirmed, the consumer's credit report will be updated to reflect that.  [Filing No. 177-3 at 8; Filing No. 177-4 at 4-5; Filing No. 178-12 at 27.]

c.   Automated Procedures Related to Reaffirmations

In addition to relying on data furnishers and consumers, the CRAs have developed and implemented an automated procedure to update accounts to be reported as discharged following entry of a Chapter 7 bankruptcy discharge order.  [Filing No. 177-4 at 5-6; Filing No. 178-12 at 23.] This procedure, called a bankruptcy "scrub," was developed pursuant to an injunction entered in *White v. Experian Information Solutions, Inc.*, 2008 WL 11518799 (C.D. Cal. Aug. 19, 2008) (the "*White* Injunction").  [Filing No. 177-2 at 4; Filing No. 177-3 at 6-7; Filing No. 177-4 at 5-6.] Pursuant to the *White* Injunction, if a furnisher is already reporting to a CRA that an account was included in bankruptcy, the CRA will either retain that reporting during the pendency of the bankruptcy and update the reporting to reflect that the account was discharged in bankruptcy once the discharge order is entered, or simply retain the "included in bankruptcy" status post-discharge. [Filing No. 177-2 at 5; Filing No. 177-3 at 7-8; Filing No. 177-4 at 6.]  The scrub was not triggered in Mr. Myers' situation because Ally was already reporting the account as included in his bankruptcy.  [Filing No. 177-2 at 5; Filing No. 177-3 at 7-8; Filing No. 177-4 at 6.]

3.   *Mr. Myers' Chapter 7 Bankruptcy*

In 2013, Mr. Myers took out an automobile loan with Ally secured by a 2013 Chevrolet Silverado.  [Filing No. 51 at 3.]  On November 7, 2018, he filed a Voluntary Petition for Chapter 7 Bankruptcy in the United States Bankruptcy Court for the Southern District of Indiana.  *In re*

*John D. Myers & Jennifer Dian Myers*, No. 1:18-bk-08492-JMC-7 (Bankr. S.D. Ind.).[5]  On his Bankruptcy Petition, Mr. Myers listed multiple creditors including Ally (secured by the 2013 Chevrolet Silverado).  [Filing No. 178-2 at 9-21.]

Mr. Myers intended to reaffirm the Ally debt because he used the Chevrolet Silverado to get to work and he knew it would be difficult to obtain another vehicle after filing for bankruptcy.  [Filing No. 178-3 at 34-36.]  He also intended to reaffirm a debt with Huntington National Bank ("Huntington") that was secured by a 2013 Chevrolet Equinox because his wife used the Equinox to get to work, and a debt with Loancare Servicing ("Loancare") secured by Mr. Myers' personal residence so that his family could remain in their home.  [Filing No. 178-3 at 36.]

The meeting of the creditors took place on December 10, 2018, and on December 20, 2018, Huntington filed a reaffirmation agreement it had entered into with Mr. Myers.  [Filing No. 178-1 at 3.]  An order discharging Mr. Myers' Chapter 7 bankruptcy was entered on January 9, 2019, but the discharge was vacated and the case was re-opened on January 10, 2019 because it was "closed in error."  [Filing No. 178-1 at 4; Filing No. 21 in *In re Myers*, No. 1:18-bk-08492-JMC-7 (Bankr. S.D. Ind.).]  On January 14, 2019, LoanCare filed a reaffirmation agreement it had entered into with Mr. Myers.[6]  [Filing No. 178-1 at 5.]

On February 8, 2019, Mr. Myers filed a motion seeking to defer entry of the bankruptcy discharge so that he could file a reaffirmation agreement with Ally.  [Filing No. 178-1 at 5; Filing No. 216-1.]  The Bankruptcy Court granted Mr. Myers' motion on February 11, 2019, [Filing No. 178-1 at 5; Filing No. 216-2], and Mr. Myers filed a reaffirmation agreement with Ally on March

---

[5] The Court "may take judicial notice of matters of public record."  *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017) (quotation and citation omitted).

[6] The reaffirmation agreement was filed by Mid America Mortgage, Inc. ("Mid America"), but related to Mr. Myers' Loancare debt secured by his residence.

1, 2019, [Filing No. 178-1 at 5; Filing No. 216-3].  Mr. Myers' bankruptcy was discharged on

March 22, 2019 and the case was closed.  [Filing No. 178-1 at 6.]  The Discharge Order did not

list which of Mr. Myers' debts were discharged versus reaffirmed.  [*See* Filing No. 178-5 at 2.]

###### 4.  *Notice of the Bankruptcy Disposition to the CRAs*

Notice of Mr. Myers' bankruptcy discharge was issued to the Bankruptcy Noticing Center

on March 24, 2019.  [Filing No. 178-1 at 6.]  The CRAs, who were listed on Mr. Myers' bankruptcy

petition, received notice of the discharge from the Bankruptcy Noticing Center.  [Filing No. 178-

6.]  The notice consisted of a copy of the Order of Discharge, but not a copy of the whole

bankruptcy docket, any reaffirmation agreements, or any other filings.  [Filing No. 178-6.]

###### 5.  *Disagreement Between Mr. Myers and Ally Regarding the Loan Status*

After the bankruptcy discharge, Mr. Myers found that it was very difficult to make

payments on the Ally loan because Ally believed that the debt had been discharged.  [Filing No.

178-3 at 47-48.]  Each time Mr. Myers called Ally to make a monthly payment, he was told that

the debt had not been reaffirmed.  [Filing No. 178-3 at 52-53.]  An internal Ally note on Mr. Myers'

account stated that Mr. Myers had failed to reaffirm the debt because he had not filed the

reaffirmation agreement within 60 days of the creditors' meeting.  [Filing No. 177-1.]  Because

Ally believed that the debt had been discharged, Mr. Myers was not able to make his monthly

payments online but instead had to repeatedly call Ally's bankruptcy department.  [Filing No. 178-

3 at 47-48.]  During his phone calls with Ally, Mr. Myers reiterated his belief that the loan had

been reaffirmed.  [Filing No. 178-3 at 114-15.]  Mr. Myers has continued making payments on the

Ally loan, but the disagreement between Mr. Myers and Ally regarding whether the loan was

reaffirmed in the bankruptcy remains.  [Filing No. 178-3 at 81-82; Filing No. 178-3 at 149-50.][7]

---

[7] The Court notes that Mr. Myers has not named Ally as a defendant in this case.

6.    *The CRAs' History With Ally*

In connection with Mr. Myers' Motion for Class Certification, the CRAs were each ordered to produce a randomly selected list of 100 consumers who had a Chapter 7 bankruptcy on file, and had an Ally account on file that was current at the time the bankruptcy was filed and for which there was a bankruptcy indicator.  [Filing No. 122 at 1.]  Of the 300 individuals whose information was provided, Ally accurately reported their account for 291 individuals, or 97% of the time. [Filing No. 165-7 at 4; Filing No. 165-8 at 3; Filing No. 165-9 at 4; Filing No. 180-1 at 3.]  For the remaining nine individuals in which Ally's reporting was not facially consistent with the bankruptcy docket, eight were confirmed as accurate through a more thorough review of the bankruptcy docket.  [Filing No. 179-14 at 45-50.]  Only one of the 300 consumers had a difference between the reporting of their Ally account and the bankruptcy docket that was not easily explained, but that consumer's bankruptcy case involved unique issues including that it was jointly filed with a spouse, that the Ally debt was listed as "community debt," and that it involved "complex legal issues."  [Filing No. 179-14 at 50; *see also* Filing No. 217-2 at 37 (Equifax's Litigation Support Consultant testifying: "Q: Is Ally Financial a reliable furnisher of consumer credit information?  A:  Yeah, as I mentioned earlier, in my 25 years here, I've not heard anything that, heard or seen anything that says otherwise.").]

7.    *The CRAs' Reporting of Mr. Myers' Ally Account*

a.    <u>Equifax</u>

On October 8, 2019 – after the bankruptcy discharge, but before this lawsuit was filed – Equifax provided Mr. Myers with a copy of his consumer disclosure at his request.  [Filing No. 177-6.]  Equifax reported the Ally account as included in Mr. Myers' bankruptcy because as of September 30, 2019, Ally reported to Equifax that this was the case.  [Filing No. 177-3 at 8; Filing

No. 177-6 at 8.] The Ally account was one of numerous other accounts and three collections on

Mr. Myers' Equifax consumer disclosure that might be considered negative by a potential creditor.

[Filing No. 177-6 at 7-25.] Equifax was also reporting Mr. Myers' discharged bankruptcy. [Filing

No. 177-6 at 7.] Mr. Myers' Huntington and Loancare accounts, which had been reaffirmed, were

reported as open and never late with a recent balance. [Filing No. 177-6 at 13-17.]

The first page of Equifax's consumer disclosure states:

Thank you for requesting your credit file, commonly called a Consumer Credit Report. Your credit file contains information received primarily from companies which have granted you credit and from public record sources. Great care has been taken to report this information correctly. Please help us in achieving even greater accuracy by reviewing all of the enclosed material carefully.

If there are items you believe to be incorrect, you may be able to initiate an investigation request via the Internet 24 hours a day, 7 days a week at:

**www.equifax.com/personal/disputes**

Using the Internet to initiate an on-line investigation request will expedite the resolution of your concerns.

Or you may complete the enclosed Research Request Form and return it to:

**Equifax Information Services LLC**
**P.O. Box 105314**
**Atlanta, GA 30348**

**NOTE:  Sending the Research Request Form to any other address will delay the processing of your request.**

Please note, when you provide documents, including a letter, to Equifax as part of your dispute, the documents may be submitted to one or more companies whose information are the subject of your dispute.

**Under the FACT Act, you have the right to request and obtain a copy of your credit score.  To obtain a copy of your credit score, please call our automated ordering system at: 1-877-SCORE-11.**

[Filing No. 177-6 at 3 (emphasis in original).] Mr. Myers never disputed his Ally account with

Equifax. [Filing No. 178-3 at 137-40.]

After Mr. Myers filed this lawsuit, Equifax initiated a reinvestigation of the Ally account on February 7, 2020, and sent an ACDV to the furnisher to confirm that Ally was accurately reporting Mr. Myers' account.  [Filing No. 177-5 at 17-18; Filing No. 179-2 at 2.]  On February 27, 2020, Ally responded to Equifax's ACDV request and confirmed that Mr. Myers' account was accurately reported as included in the bankruptcy, as denoted by the CII of "A."  [Filing No. 177-5 at 25-27; Filing No. 179-2 at 2.]

b.    <u>Experian</u>

Experian provided one consumer disclosure to Mr. Myers, at his request, between the discharge of Mr. Myers' bankruptcy and the filing of this lawsuit.  [Filing No. 177-7.]  As of the date of the consumer disclosure – October 8, 2019 – Experian was reporting the Ally account as discharged in bankruptcy and "[n]ever late."  [Filing No. 177-7 at 3.]  Experian was not reporting a monthly payment amount or the recent balance.  [Filing No. 177-7 at 3.]  The Ally account was one of numerous accounts on Mr. Myers' Experian credit disclosure that might be considered negative by a potential creditor.  [Filing No. 177-7 at 3-10.]  Additionally, Experian was reporting Mr. Myers' bankruptcy.  [Filing No. 177-7 at 2.]  Experian was not reporting the Huntington or Loancare accounts as discharged in bankruptcy, and they were both reported positively as open and never late with recent balances.  [Filing No. 177-7 at 7-8.]

The Experian consumer disclosure provided to Mr. Myers stated:

> Before contacting us, please review this report carefully.  If you disagree with an item, you may dispute it.  We will process disputes generally by sending your dispute to the furnisher of the information or to the vendor who collected the information from a public record.

> The fastest and easiest way to dispute most information that you disagree with is by creating your member login at experian.com/disputes.  Keep track of any changes and dispute notifications online.  You can also call with disputes or questions at 800 509 8495, M – F 9am – 5pm in your time zone, or submit your dispute in writing by mailing to Experian, NCAC, P.O. Box 2002, Allen TX 75013.

13

> Be advised that written information or documents you provide with respect to your disputes may be shared with all creditors with which you are disputing.

[Filing No. 177-7 at 2.]  The consumer disclosure further provided:

> You have the right to dispute incomplete or inaccurate information.  If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous.  See www.consumerfinance.gov/learnmore for an explanation of dispute procedures.

[Filing No. 177-7 at 13.]  The consumer disclosure attached a blank Dispute Form, which stated: "Use this form for any disputes you wish to submit by mail."  [Filing No. 177-7 at 16.]

Mr. Myers never submitted a dispute to Experian regarding the reporting of the Ally account and never provided Experian with a copy of the Ally reaffirmation agreement.  [Filing No. 178-3 at 49; Filing No. 179-4 at 4.]  Instead, Mr. Myers relied on his attorneys to fix Experian's reporting of the Ally account.  [Filing No. 178-3 at 28.]

When Equifax sent the ACDV to Ally to confirm that it was accurately reporting Mr. Myers' Ally account, Ally sent a carbon copy of its response to the ACDV to Experian on February 27, 2020.  [Filing No. 178-11 at 8-12; Filing No. 179-5 at 2-3.]  The carbon copy of the ACDV response contained the CII of "A" for the Ally account, meaning that it had been included in Mr. Myers' bankruptcy petition.  [Filing No. 178-11 at 12-13; Filing No. 179-5 at 2.]  Experian updated its reporting of the Ally account the following day to reflect that the account was included in the bankruptcy petition, rather than that it had been discharged.  [Filing No. 179-5 at 2.]  On March 31, 2020, Experian also sent its own ACDV to the data furnisher to confirm the accuracy of its reporting, and Ally confirmed that the account should continue reporting as included in the bankruptcy petition.  [Filing No. 179-6.]

14

c.      Trans Union

Trans Union provided Mr. Myers with a copy of his consumer disclosure on October 8, 2019, at his request.  [Filing No. 177-8.]  At that time, Trans Union was reporting the Ally account as included/discharged in Mr. Myers' bankruptcy, with timely payments both during the pendency of the bankruptcy and thereafter.  [Filing No. 177-8 at 5.]  Trans Union was not reporting a monthly payment amount or the recent balance of the Ally account.  [Filing No. 177-8 at 5.]  The Ally account was one of numerous accounts on Mr. Myers' consumer disclosure that might be considered negative by a potential creditor.  [Filing No. 177-8.]  Trans Union was reporting Mr. Myers' discharged bankruptcy, [Filing No. 177-8 at 4], and was reporting that the Huntington and Loancare accounts were open and never late with balances (and not as discharged in the bankruptcy), [Filing No. 177-8 at 11-12].

The Trans Union consumer disclosure provided to Mr. Myers stated:

If you believe an item of information to be incomplete or inaccurate, please alert us immediately.  We will investigate the data and notify you of the results of our investigation.

To make it easier to request an investigation, you can now submit your request online, **24 hours a day, 7 days a week**.  You must have an active email address to use the online service.  Please note that your email address will only be used for communicating with you regarding your request and the results of our investigation.

Your email address will not be shared with any non-TransUnion entities.

**To submit an online request for investigation:**

**Step 1.**  Go to the TransUnion online investigation service at http://transunion.com/ disputeonline
**Step 2.**  Follow the instructions provided by the web site.

Once submitted, you will receive online confirmation of your request.  You will also be notified by email when we complete our investigation and your results will be available online.  You can check the status of your investigation online by logging into your account.

Thank you for helping ensure the accuracy of your credit information.

[Filing No. 177-8 at 2 (emphasis in original).]

Mr. Myers never contacted Trans Union regarding the reporting of the Ally account.

[Filing No. 178-3 at 49; Filing No. 178-3 at 160-61.]  Instead, Mr. Myers relied upon his attorney

to fix the way in which Trans Union was reporting the Ally account.  [Filing No. 178-3 at 28;

Filing No. 178-3 at 161.]

On February 10, 2020, after Mr. Myers filed this lawsuit, Trans Union sent Ally an ACDV[8]

and explained that "[t]he account was reaffirmed in bankruptcy case number 18 08492 JMC 7 filed

in the Southern District of Indiana."  [Filing No. 179-8.]  In response, Ally confirmed that the

account was not reaffirmed, but was instead included in the bankruptcy, and added a note that Mr.

Myers disagreed with Ally's position.  [Filing No. 179-9 at 5.]  In any event, Trans Union deleted

the Ally account from Mr. Myers' file on March 10, 2020.  [Filing No. 179-10 at 5.]

### 8.    *Mr. Myers' Efforts to Obtain Credit Post-Bankruptcy Discharge*

After Mr. Myers' bankruptcy was discharged, he applied for several new credit cards in an

attempt to repair his credit.  [Filing No. 178-3 at 61.]  At that time, he feared that he might have

trouble rebuilding his credit due to the bankruptcy.  [Filing No. 178-3 at 61-62; Filing No. 178-3

at 105-06; Filing No. 178-3 at 163.]  Mr. Myers knew that a Chapter 7 bankruptcy is a major

derogatory event, but this and his fear of being rejected for new credit cards or loans did not deter

him from applying.  [Filing No. 178-3 at 13; Filing No. 178-3 at 19-20; Filing No. 178-3 at 41-42;

Filing No. 178-3 at 62-63.]  After the bankruptcy discharge, Mr. Myers opened several new

accounts and purchased numerous items including a new television and a new car.  [Filing No.

---

[8] Experian also received a carbon copy of this ACDV, which again confirmed for Experian that
the Ally account should be reported as included in Mr. Myers' bankruptcy petition.

178-3 at 11-12; Filing No. 178-3 at 128-30; Filing No. 178-3 at 147.]  He also received several credit denials, but was never told that the denials related to the CRAs' reporting of the Ally account – only that the denials stemmed from his bankruptcy.  [Filing No. 178-3 at 62-63; Filing No. 178-3 at 108; Filing No. 178-3 at 122-23; Filing No. 178-3 at 154-55.]  When purchasing a new car in May 2021, the automobile dealership asked Mr. Myers if he had surrendered the 2013 Chevrolet Silverado that secured the Ally account, Mr. Myers explained that he had not surrendered it, and he was approved to purchase a 2021 GMC Acadia the same day.  [Filing No. 178-3 at 13-15.]  The Home Depot denied Mr. Myers credit, noting that the denial was based on the reporting of his Chapter 7 bankruptcy on his Experian credit report, but did not reference the Ally account or any specific account that had been discharged in the bankruptcy.  [Filing No. 177-9.]

> ### 9.    *The Lawsuit*

Mr. Myers initiated this lawsuit in Rush County Superior Court on January 13, 2020 and Trans Union removed the case to this Court, with the consent of Equifax and Experian, on February 4, 2020.  [Filing No. 1; Filing No. 1-2.]  Mr. Myers filed the operative Amended Complaint on July 30, 2020, in which he asserts individual and class claims for violations of § 1681e(b) of the FCRA.  [Filing No. 51 at 9.]  On behalf of himself and putative class members, he seeks statutory damages ranging from $100 to $1,000 under § 1681n(a)(1)(A), punitive damages under § 1681n(a)(2) for each violation, and attorneys' fees and costs under § 1681n and 1681o.  [Filing No. 51 at 9.]  Mr. Myers seeks to represent a class of "[a]ll consumers in the United States whose consumer reports inaccurately reported reaffirmed accounts as included or discharged in the consumer's bankruptcy and disclosed to a third party."  [Filing No. 164 at 9.]  He also seeks to represent the following sub-classes:

> All consumers in the United States whose consumer reports inaccurately reported reaffirmed accounts as included or discharged in the consumer's bankruptcy when

the information furnisher was reporting payments being made during and/or after the bankruptcy and disclosed to a third party.

All consumers in the United States whose consumer reports inaccurately reported reaffirmed accounts as included or discharged in the consumer's bankruptcy when the bankruptcy file shows Bankruptcy Form 427 and/or the reaffirmation agreement was filed and where this information was disclosed to a third party.

[Filing No. 164 at 9-10.]

## C.   Discussion

### 1.   Scope of Mr. Myers' Claims

At the outset, the Court considers the scope of Mr. Myers' claims. Specifically, along with a claim for willful violation of § 1681e(b) under § 1681n, Mr. Myers asserts a claim for negligent violation of § 1681e(b) in his Amended Complaint pursuant to § 1681o, [Filing No. 51 at 9 (Mr. Myers alleging that the CRAs "are liable to [him] for willfully and negligently violating the requirements imposed…under…§ 1681e(b)" and seeking attorneys' fees and costs under § 1681o)]. However, the Court finds that he has abandoned his negligence claim for two reasons. First, Mr. Myers appears to only seek attorneys' fees and costs under § 1681o, [*see* Filing No. 51 at 9], but he must show that he has suffered actual damages to succeed on a § 1681o claim in the first instance, *Persinger v. Southwest Credit Sys., L.P.*, 20 F.4th 1184, 1194 (7th Cir. 2021). Because he must show that he suffered actual damages to recover under § 1681o for negligent violation of § 1681e(b), his negligent violation claim fails. Second, Mr. Myers does not mention his claim for negligent violation of the FCRA in his Statement of Claims, [*see* Filing No. 116], which also results in abandonment of that claim. *Jackson v. Regions Bank*, 838 Fed. App'x 195, 198 (7th Cir. 2021) (affirming this Court's treatment of claims not preserved in the Statement of Claims as abandoned). Because Mr. Myers has abandoned any claim for actual damages, the Court

**DENIES AS MOOT** the CRAs' Motion for Summary Judgment to the extent it relates to a claim for actual damages or for any claim under § 1681o.

>    2.    *Standing*

Before the Court considers the substance of Mr. Myers' remaining claims, it must determine whether Mr. Myers has standing to sue, which is a jurisdictional requirement. *Persinger*, 20 F.4th at 1189 (courts "have an independent obligation to inspect, and remain within, jurisdictional boundaries") (quotation and citation omitted). Standing is a threshold issue, and the Court must discuss it at the outset. *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020). To have standing to sue in federal court under Article III, a plaintiff must establish: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

"Because standing is an essential ingredient of subject-matter jurisdiction, it must be secured at each stage of the litigation." *Bazile*, 983 F.3d at 278. Although at the pleading stage "general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*, 504 U.S. at 561, "[o]nce the allegations supporting standing are questioned as a factual matter – either by a party or by the court – the plaintiff must support each controverted element of standing with 'competent proof,'" *Bazile*, 983 F.3d at 278 (quoting *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)). "Competent proof" means "a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Retired Chi. Police Ass'n v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996). Significantly, "a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would

have afforded them standing had they been named plaintiffs," and "a person cannot predicate standing on injury which he does not share." *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) (quotation and citation omitted).  In short, "[s]tanding cannot be acquired through the back door of a class action." *Id.* (quotation and citation omitted).

The parties do not explicitly address whether Mr. Myers has standing, but the CRAs argue in their Motion for Summary Judgment that Mr. Myers has not presented competent evidence that the CRAs' reporting of the Ally loan as discharged, rather than his poor credit history and bankruptcy discharge, caused him any injury in fact.  [Filing No. 182 at 31-32.]  The CRAs note Mr. Myers' deposition testimony that he knew when he filed for bankruptcy that it would damage his credit for years and make it harder to obtain new credit, and also point to Mr. Myers' lack of evidence that any credit denials were connected to the CRAs' reporting of the Ally loan.  [Filing No. 182 at 32.]  As for emotional distress damages, the CRAs argue that any stress Mr. Myers suffered related to the Ally loan was from Ally insisting that the debt was discharged, and not from anything the CRAs did.  [Filing No. 182 at 32-33.]  They contend that Mr. Myers never even disputed the CRAs' reporting of the Ally loan as discharged, instead leaving resolution of the issue up to his attorneys.  [Filing No. 182 at 33.]  The CRAs claim that the "garden-variety" stress Mr. Myers claims he suffered is not enough to show that he suffered emotional distress or a legally cognizable injury.  [Filing No. 182 at 33.]  In short, the CRAs argue that Mr. Myers has not established a causal relationship between the violation of the FCRA and the loss of credit or some other harm.  [Filing No. 182 at 34.]

In his response, Mr. Myers argues that he need not establish that he suffered actual damages to seek statutory damages for willful noncompliance with the FCRA.  [Filing No. 219 at 35.]

The CRAs reiterate their arguments in their reply.  [Filing No. 226 at 16.]

Even though Mr. Myers has not presented any evidence that he suffered actual damages for purposes of recovering for a negligent violation of the FCRA under § 1681o, he can still seek statutory and punitive damages under § 1681n for a willful violation of the FCRA. *See Meyers v. Nicolet Rest. Of De Pere, LLC*, 843 F.3d 724, 725 (7th Cir. 2016) ("Each willful violation entitles consumers to recover *either* 'any actual damages sustained…as a result' of the violation *or* statutory damages of between $100 and $1,000.") (quoting 15 U.S.C. § 1681n(a)(1)(A) (emphasis added)). Importantly, though, Mr. Myers still must show that he suffered an injury-in-fact in order to seek redress for a willful violation. *McIntyre v. RentGrow, Inc.*, 34 F.4th 87, 93 n.2 (1st Cir. 2022) ("Even without a showing of actual damages, a plaintiff who seeks to press a willful noncompliance claim [under the FCRA] must show an injury in fact sufficient to support standing.") (citing *Trans Union LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021)).

In *Spokeo, Inc. v. Robins*, the Supreme Court held that a "bare procedural violation [of the FCRA] divorced from any concrete harm" does not satisfy the injury-in-fact requirement of Article III. 578 U.S. 330, 341 (2016). The Supreme Court also found, however, that "the risk of real harm" can satisfy the requirement of concreteness where the violation of the FCRA is of a right granted by the statute and the plaintiff "need not allege any additional harm beyond the one Congress has identified." *Id.* at 342 (emphasis omitted). Subsequently, the Supreme Court held that a plaintiff has standing to sue for an FCRA violation where a misleading credit report was provided to a third party, because this dissemination constituted "concrete reputational harm." *Ramirez*, 141 S. Ct. at 2200; *see also Chuluunbat v. Experian Info. Solutions, Inc.*, 4 F.4th 562, 566 n.3 (7th Cir. 2021) (plaintiffs had standing to assert FCRA claims where they had all alleged that their credit reports were accessed by third parties).

The record evidence in this case shows – and the CRAs have not disputed – that all of the CRAs disseminated Mr. Myers' credit report to third parties during the time that the CRAs were reporting the Ally loan as discharged instead of reaffirmed.  [*See* Filing No. 177-6 at 26 (Equifax consumer disclosure reflecting that numerous potential creditors requested (and were provided) Mr. Myers' credit report from the time his bankruptcy was discharged to the time he filed this lawsuit); Filing No. 177-7 at 10 (Experian consumer disclosure showing the same for Experian); Filing No. 177-8 at 15-18 (Trans Union consumer disclosure showing the same for Trans Union).] Under *Spokeo* and *Ramirez*, the Court finds that, because Mr. Myers' allegedly inaccurate credit report was disseminated to third parties, he has standing to assert his claims under the FCRA.  The Court next considers the merits of those claims.

### 3.    Whether the CRAs Violated § 1681e(b)

Mr. Myers claims that the CRAs willfully violated the FCRA, which requires him to prove that they acted "with actual knowledge or reckless disregard for the FCRA's requirements." *Persinger*, 20 F.4th at 1195 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007)).  This "raises a sequencing issue," where "[c]ourts may pass over the antecedent question of whether a violation occurred, moving directly to whether the defendant negligently or willfully violated the statute," which "is akin to the sequencing dilemma courts face in qualified immunity cases." *Persinger*, 20 F.4th at 1196.  The Court will follow the Supreme Court's approach in *Safeco* and the Seventh Circuit's approach in *Persinger*, however, and first considers whether the CRAs have violated the FCRA.

15 U.S.C. § 1681e(b) provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  In order for Mr. Myers to

succeed on his FCRA claim, he must show that the CRAs' consumer reports contained inaccurate information. *See Walton v. BMO Harris Bank N.A.*, 761 Fed. App'x 589, 591 (7th Cir. 2019) (holding that a CRA "cannot be held liable as a threshold matter [under § 1681e(b)] if it did not report inaccurate information").  Additionally, the FCRA "is not a strict liability statute," *id.* at 591, and "does not require unfailing accuracy from consumer reporting agencies," *Denan v. Trans Union LLC*, 959 F.3d 290, 294 (7th Cir. 2020).  If a CRA followed "reasonable procedures to assure maximum possible accuracy," but reported inaccurate information anyway, it is not liable under the FCRA. *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994).  Additionally, "[n]either the FCRA nor its implementing regulations impose…a duty [upon CRAs] to determine the legality of a disputed debt." *Denan*, 959 F.3d at 295.

The CRAs argue that they did not violate § 1681e(b) for three reasons: (1) they accurately reported the Ally account as discharged in bankruptcy; (2) determining whether the Ally loan was successfully reaffirmed and, consequently, inaccurately reported, would require the type of legal analysis that they are not obligated to undertake; and (3) they were entitled to rely on information furnished by Ally.  The Court considers each reason in turn.

a.    Whether the CRAs Accurately Reported Mr. Myers' Ally Account

The CRAs initially argue that they correctly reported Mr. Myers' account, so his FCRA claim fails as a matter of law.  [Filing No. 182 at 19-22.]  They assert that Mr. Myers' reaffirmation agreement with Ally did not comply with the deadlines set forth in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure because: (1) it was filed more than 60 days after the creditors' meeting, in violation of FRBP 4008(a); and (2) it was filed after the bankruptcy court initially entered its January 9, 2019 discharge order, in violation of 11 U.S.C. § 524(c)(1).  [Filing No. 182 at 20-22.]

In his response, Mr. Myers argues that he complied with the Bankruptcy Code in filing his reaffirmation agreement. [Filing No. 219 at 17-20.] He contends that the Federal Rules of Bankruptcy Procedure allow a debtor to seek an extension of the grant of the discharge, which then extends the debtor's time for filing a reaffirmation agreement, and notes that he sought such an extension, the bankruptcy court granted an extension, and he filed his reaffirmation agreement with Ally by the extended deadline. [Filing No. 219 at 17-18.]

The CRAs argue in their reply that strict compliance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure is required, and that Mr. Myers did not request an extension of the deadline to file a reaffirmation within 60 days of the creditors' meeting as required by Rule 4008(a), nor did the bankruptcy court extend that deadline. [Filing No. 226 at 5.]

Two provisions govern the timing of the filing of a reaffirmation agreement. First, 11 U.S.C. § 524(c)(1) provides that a reaffirmation agreement "is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if – (1) such agreement was made before the granting of the discharge." Second, FRBP 4008(a) provides that "[a] reaffirmation agreement shall be filed no later than 60 days after the first date set for the meeting of creditors under § 341(a) of the Code." A review of the docket in Mr. Myers' bankruptcy reflects the following events related to the filing of the reaffirmation agreement with Ally:

- December 10, 2018: The creditors' meeting took place. [Filing No. 178-1 at 3];

- January 9, 2019: The bankruptcy court entered the first Discharge Order. [Filing No. 178-1 at 4];

- January 10, 2019: The bankruptcy court entered an "Administrative Order Reopening Bankruptcy Case, Order Vacating Final Decree and Notice of Reappointment of Trustee." [Filing No. 178-1 at 4.] The Order, accessed only by clicking on the docket entry, states: "This case was closed in error on January

24

9, 2019." [Filing No. 21 in *In re Myers*, No. 1:18-bk-08492-JMC-7 (Bankr. S.D. Ind.)];

- February 8, 2019:  Mr. Myers filed a Motion to Defer Entry of Discharge, requesting that the bankruptcy court defer entry of discharge "until after February 22, 2019 to allow Debtors and Ally Financial to sign and file reaffirmation agreement." [Filing No. 30 in *In re Myers*, No. 1:18-bk-08492-JMC-7 (Bankr. S.D. Ind.)];

- February 11, 2019:  The bankruptcy court granted Mr. Myers' Motion to Defer Entry of Discharge, deferring discharge to March 13, 2019.  [Filing No. 178-1 at 5];

- March 1, 2019:  Mr. Myers filed his reaffirmation agreement with Ally.  [Filing No. 178-1 at 5]; and

- March 22, 2019:  The bankruptcy court entered the discharge order.  [Filing No. 178-1 at 6].

While the January 9, 2019 order of discharge was entered in error, the face of the docket indicates that the Ally reaffirmation agreement was filed more than 60 days after the creditors' meeting.[9]  [*See* Filing No. 178-1.]  But Mr. Myers claims that the deadline for extending entry of the discharge also extended any obligation he had to file the reaffirmation agreement within 60 days of the creditors' meeting.

The Court notes that neither Mr. Myers' Motion to Defer Entry of Discharge nor the bankruptcy court's Order granting that motion mention extending the deadline imposed by FRBP 4008(a).  However, the Court also recognizes that the reaffirmation agreement between Mr. Myers and Ally is reflected on the bankruptcy docket, [Filing No. 178-1 at 5], and that the docket does not reflect that the bankruptcy court rejected the reaffirmation agreement due to a timing issue.

---

[9] Internal Ally notes indicate that, at least as of December 31, 2019, Ally believed the reaffirmation agreement was not timely filed because it was filed more than 60 days after the creditors' meeting, in violation of FRBP 4008(a).  [Filing No. 177-1 at 2 ("debtor failed to reaffirm per SOI, no motion to extend A/S by trustee, A/S termination per 362H, no order coming, 341 meeting: 121018, reaff deadline per Rule 4008A 020819.").]

The CRAs' expert witness, Judge William Houston Brown, explained in his expert report, however, that:

> Unless some dispute about [a reaffirmation agreement] is presented to the bankruptcy court through motion practice, the parties' reaffirmation agreement is simply filed with the court clerk and would appear on the case docket entries. But the filing of the document does not mean that any questions about validity or enforceability of the agreement have been resolved. Filing is an administrative act by the clerk and not an adjudication by the court that the reaffirmation is valid or in compliance with all Code requirements.

[Filing No. 179-14 at 20.]

The docket in the bankruptcy case reflects two realities: the reaffirmation agreement was on the docket, but was filed was filed more than 60 days after the creditors' meeting. The mere existence of the reaffirmation agreement on the bankruptcy docket does not necessarily establish that the reaffirmation agreement was valid, particularly given the tardy timing. But this Court declines to decide whether the reaffirmation agreement was valid – an issue that is properly decided by the bankruptcy court, but for which neither Mr. Myers nor Ally sought clarification. *See Cosgriff v. Cnty. of Winnebago*, 876 F.3d 912, 915 (7th Cir. 2017) (applying principles of comity to bar plaintiff from bringing certain claims in federal court that were more properly decided by another tribunal). Instead, the Court assumes for purposes of deciding the CRAs' Motion for Summary Judgment that the reaffirmation agreement between Mr. Myers and Ally was valid. The Court goes on to consider whether the CRAs violated the FCRA by not reporting the Ally account as reaffirmed.

> b.   Whether Reporting the Reaffirmation Required a Legal Determination That the CRAs Were Not Obligated to Undertake

The CRAs argue that they cannot be held liable for a violation of § 1681e(b) of the FCRA because any inaccuracy in their reporting of the Ally account involves two legal issues that are "not suitable for resolution by the CRAs," including a contract dispute between Mr. Myers and

Ally and a dispute regarding the validity of the reaffirmation agreement in the bankruptcy proceeding. [Filing No. 182 at 23-24.] The CRAs argue that Mr. Myers' "own actions confirm the legal nature of his dispute with Ally: when Ally informed [Mr. Myers] that his debt was not reaffirmed, he contacted attorneys to address the issue." [Filing No. 182 at 24.] They also note that resolving the dispute as to whether the reaffirmation agreement is valid "turns on complex questions of bankruptcy law that far exceed the competencies of [the CRAs]." [Filing No. 182 at 24 (quotation, citation, and alteration omitted).] The CRAs assert that Mr. Myers could have obtained a binding resolution of his dispute with Ally from the bankruptcy court and that, if he had done so, the CRAs would have been competent to ascertain how to report the Ally account. [Filing No. 182 at 25.]

Mr. Myers argues in his response that "[t]he distinction between 'legal' and 'factual' inaccuracies…is a false one and is not found within the text of [§ 1681e(b)]." [Filing No. 219 at 23.] He asserts that the CRAs could determine whether a debt has been reaffirmed "by simply referring to the same electronic dockets from which [they] obtain other details of a bankruptcy they voluntarily report." [Filing No. 219 at 24.] He argues that the CRAs' position that reporting the Ally account as reaffirmed would require complex legal analysis is not credible because "they are reporting the debt as discharged in bankruptcy, which in itself is the same legal analysis they claim they cannot do," and the reaffirmation was filed on an Official Bankruptcy Form 427, which "appears on the docket and is readily searchable as illustrated by the annual governmental report." [Filing No. 219 at 25.] He contends that simply determining whether he filed a reaffirmation agreement does not require any legal determination, and that the CRAs have never undertaken such an analysis and "never sought this…information from the bankruptcy courts or their public records vendors." [Filing No. 219 at 27.] He notes that some of the CRAs provide their employees

with instructions for verifying bankruptcy information using PACER and that "it is not credible for [the CRAs] to suggest that this is work reserved for judges and lawyers and wash its hands of any responsibility for reporting some bankruptcy public record information but not information about reaffirmations of debt appearing on their credit reports."  [Filing No. 219 at 28.]

      In their reply, the CRAs argue that they "receive high-level information related to consumer bankruptcies from their respective public records vendors, such as the consumer's name, the type of bankruptcy filed…, the date the consumer filed bankruptcy, the court in which the consumer filed for bankruptcy, and whether the bankruptcy was discharged or dismissed."  [Filing No. 226 at 7.] They contend that going a step further and reviewing the bankruptcy docket for reaffirmation agreements would require them to "analyze each reaffirmation agreement, attempt to match it with a debt in the consumer's file, and determine whether the agreement complied with applicable bankruptcy law."  [Filing No. 226 at 7.]  They assert that filing a reaffirmation agreement is not the same as reaffirming a debt, because the reaffirmation agreement must actually comply with § 524(c) to be effective.  [Filing No. 226 at 7-8.]  The CRAs argue that the FCRA does not require them to analyze whether a reaffirmation agreement is valid under applicable bankruptcy rules, and note that Ally told them that the debt had not been reaffirmed and that Mr. Myers is asking them to "override direct information from one of the only two parties to the agreement."  [Filing No. 226 at 8-9.]

      In *Denan*, the Seventh Circuit Court of Appeals considered whether Trans Union violated § 1681e(b) when it reported a debt that the consumer argued was illegally issued, but that the creditor had verified.  959 F.3d 290.  In finding that Trans Union had not violated § 1681e(b), the Seventh Circuit explained the role of furnishers and CRAs as follows:

> The FCRA imposes duties on consumer reporting agencies and furnishers in a manner consistent with their respective roles in the credit reporting market.

> Furnishers – such as banks, credit lenders, and collection agencies – provide consumer data to consumer reporting agencies. In turn, those agencies compile the furnished data into a comprehensible format, allowing others to evaluate the creditworthiness of a given consumer. Consumer reporting agencies and furnishers, though interrelated, serve discrete functions: furnishers report data to incentivize the repayment of debts, while consumer reporting agencies compile and report that data for a fee. What results is a credit reporting system, producing a vast flow and store of consumer information. For example, according to the Consumer Financial Protection Bureau, each of the nationwide consumer reporting agencies receive information from furnishers on over 1.3 billion consumer credit accounts or trade lines on a monthly basis.

*Denan*, 959 F.3d at 294. The Seventh Circuit went on to note that requiring a CRA to "verify [a consumer's] debt liability" would "attempt to graft responsibilities of data furnishers and tribunals onto a consumer reporting agency. Only furnishers are tasked with accurately reporting liability. And it makes sense that furnishers shoulder this burden: they assumed the risk and bear the loss of unpaid debt, so they are in a better position to determine the legal validity of a debt…. [CRAs] collect consumer information supplied by furnishers, compile it into consumer reports, and provide those reports to authorized users." *Id.* at 295. It concluded that determining the validity of the plaintiff's debt involved three legal issues – whether the choice-of-law provision in the loan agreements was enforceable, whether the loans were void under the applicable state laws, and whether tribal sovereign immunity shielded various parties from the application of those states' laws – and that "[t]he power to resolve these legal issues exceeds the competencies of consumer reporting agencies." *Id.*

While cases refusing to impose a duty on CRAs to determine the legality of a debt generally involve questions of the validity of a debt, the Court finds the situation here – the validity of the reaffirmation agreement – to be analogous. As the Seventh Circuit has explained, factual issues for which CRAs are responsible to accurately report include, for example, "the amount a consumer owes, and what day a consumer opened an account or incurred a payment." *Chuluunbat*, 4 F.4th

568. In contrast, a legal issue requires a CRA to "make [a] legal determination[ ] about the facts or legal judgments." *Id.* Here, it is true that the filing of the reaffirmation agreement is a factual issue, ascertainable from a quick review of Mr. Myers' bankruptcy docket. But the mere filing of the reaffirmation agreement does not necessarily mean that it was valid. Indeed, Ally told the CRAs that the loan had not been reaffirmed and Ally's internal records indicate that it compared the date of the creditors' meeting with the date the reaffirmation agreement was filed and determined that the reaffirmation agreement was filed late and was not valid. Any further determination regarding the reaffirmation agreement's validity would require the CRAs to delve into applicable bankruptcy rules to determine whether Mr. Myers' motion to extend the deadline for discharge also operated to extend the 60-day deadline related to the creditors' meeting. This is a legal determination that requires the CRAs to apply law to the facts, that "exceeds the competencies" of the CRAs, and that is one which the CRAs are not required to make under the FCRA. *Denan*, 959 F.3d at 295. Accordingly, the Court finds that the CRAs did not violate § 1681e(b) by reporting the Ally account as discharged instead of reaffirmed.

c.   Whether the CRAs Were Entitled to Rely Upon Information From Ally

In the interest of thoroughness, the Court also considers whether the CRAs were entitled to rely on information from Ally in reporting Mr. Myers' Ally account as discharged. The CRAs argue in support of their Motion for Summary Judgment that "CRAs comply with Section 1681e(b) as a matter of law by correctly reporting information provided to them by furnishers absent prior notice that the information is inaccurate or comes from an unreliable source." [Filing No. 182 at 26.] They note that Mr. Myers seeks to hold them responsible for assuming that there was a dispute regarding the Ally account (absent Mr. Myers ever disputing the account with the CRAs) and then ignoring the information they received from Ally. [Filing No. 182 at 26.] They argue that Ally's

reporting of the account matched the other information in Mr. Myers' credit file, including that he had received a discharge from Chapter 7 bankruptcy and had discharged several other pre-bankruptcy debts, and the CRAs had no reason to question the accuracy of the information Ally had provided.  [Filing No. 182 at 27.]  The CRAs point to evidence that they were not aware of any prior issues with creditors not accurately reporting reaffirmed accounts, and note that the CRAs provided a random sample of 100 consumers each whose Ally debts were current at the time of their Chapter 7 bankruptcy and for which there was a bankruptcy indicator on their account, that "Ally is close to perfect when it comes to reporting the status of consumers' debts following Chapter 7 bankruptcy," and that "[o]f the 300 consumers sampled, Ally reported debts as reaffirmed when the consumer filed what appeared to be a valid reaffirmation agreement, and as discharged when they did not."  [Filing No. 182 at 28.]

In response, Mr. Myers argues that the CRAs "already report the docket number and jurisdiction of every bankruptcy, so there is no additional effort involved in viewing docket entries that [use] the same sources.  At the very least, this presents a triable issue as to whether [the CRAs] acted reasonably in reporting some, but not all, material information regarding [Mr. Myers'] bankruptcy."  [Filing No. 219 at 25.]  Mr. Myers contends that the CRAs are capable of using PACER to determine whether a reaffirmation agreement has been filed, and that the information regarding Mr. Myers' bankruptcy was available from a single source that the CRAs already review to provide certain bankruptcy information.  [Filing No. 219 at 27-28.]

In their reply, the CRAs reiterate their arguments regarding the accuracy of information from Ally in the past and the sample of creditors with Ally accounts, the vast majority of which were reported accurately.  [Filing No. 226 at 10-11.]  They assert that Mr. Myers "falsely equates filing a reaffirmation agreement with successfully reaffirming a debt," and that "[t]he two are not

the same, and assuming that a debt is reaffirmed whenever a reaffirmation agreement is filed…would systematically and predictably cause the CRAs to report that consumers remain liable for discharged debts." [Filing No. 226 at 12.]  The CRAs argue that Mr. Myers does not allege that Ally is unreliable, nor does he present evidence that this is the case. [Filing No. 226 at 13.][10]

As for Mr. Myers' argument that the CRAs already report certain information from the bankruptcy docket so should be required to also look at whether a reaffirmation agreement has been filed, the facts of this case demonstrate that the issue is not that simple.  As the CRAs' expert, Judge Brown, explained in his report, the filing of a reaffirmation agreement in a bankruptcy is "an administrative act by the clerk and not an adjudication by the court that the reaffirmation is valid or in compliance with all Code requirements." [Filing No. 179-14 at 20.]  He also explains that a debtor may rescind a reaffirmation agreement within 60 days of the filing of the reaffirmation agreement or entry of discharge, whichever is later.  [Filing No. 179-14 at 20.]  All this to say that the mere presence of a reaffirmation agreement on the docket may not tell the whole story regarding whether the reaffirmation agreement is valid.   Indeed, the Court can conceive of situations where Mr. Myers' approach – to report a debt as reaffirmed based on the presence of the reaffirmation agreement on the docket alone – could lead to inaccurate reporting.  For example, if

---

[10] The CRAs also filed a Notice of Supplemental Authority, advising the Court of an Eighth Circuit case involving a § 1681e(b) claim related to the reporting of a debt following bankruptcy discharge that was decided after briefing on the Motion for Summary Judgment was complete, [Filing No. 227], and Mr. Myers filed a Response to Defendants' Notice of Supplemental Authority, [Filing No. 228].  Aside from the fact that the Court is not inclined to rely upon Eighth Circuit authority when the Seventh Circuit has provided clear guidance on the issues involved in this case, neither the Federal Rules of Civil Procedure nor this Court's Local Rules provide for the filing of "supplemental authority" once briefing of a motion is complete, and the parties did not seek leave of Court for their filings.  Further, the Court assures the parties that it conducts its own research on the issues presented in the cases on its docket and cautions the parties to avoid the practice of providing supplemental authority after briefing on a motion has closed going forward.

the creditor has not signed the reaffirmation agreement or if the debtor later rescinds the reaffirmation agreement, these circumstances may not be reflected on the docket.  And while anomalies may exist regarding discharge orders, this case is not about the reporting of discharged debts and Mr. Myers has not presented record evidence that CRAs do not require their vendors and furnishers to provide accurate information using the Metro 2 format – which includes instructions for reporting reaffirmations.

In any event, here the CRAs have shown as a matter of law that they reasonably relied on information from Ally regarding Mr. Myers' account, which the Seventh Circuit has found shields them from liability under § 1681e(b).  Specifically, in connection with determining whether the plaintiff had suffered damages, the Seventh Circuit has held that liability to reinvestigate a tradeline under the FCRA is not triggered when the CRA had no reason to believe that the furnisher was an unreliable source. *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 608 (7th Cir. 2005).  Further, in *Sarver v. Experian Info. Solutions*, the Seventh Circuit considered whether a consumer could succeed on a § 1681e(b) claim where only one account was reported as included in bankruptcy and the consumer claimed that "[this] anomaly should have alerted Experian…to the fact that the report was inaccurate." 390 F.3d 969, 972 (7th Cir. 2004).  The Seventh Circuit disagreed, stating:

> What [plaintiff] is asking…is that each computer-generated report be examined for anomalous information and, if it is found, an investigation be launched.  In the absence of notice of prevalent unreliable information from a reporting lender, which would put Experian on notice that problems exist, we cannot find that such a requirement to investigate would be reasonable given the enormous volume of information Experian processes daily.

*Id.*

Here, Mr. Myers has not presented any evidence to counter the CRAs' evidence that Ally was a trusted furnisher with no past issues regarding failing to provide accurate information.  [*See*

Filing No. 165-7 at 4; Filing No. 165-8 at 3; Filing No. 165-9 at 4; Filing No. 180-1 at 3; Filing No. 217-2 at 11-12; Filing No. 217-2 at 37.]  Moreover, the sampling of Ally account information shows that Ally accurately reported post-bankruptcy information about consumers' debts in 291 of 300 instances, that 8 of those cases were explained after a closer review of the individual's bankruptcy docket, and that only one case was a discrepancy that was not easily explained but that it involved numerous "complex legal issues." [Filing No. 179-14 at 40-50.]

Additionally, while a consumer is not required to dispute an account with a CRA before bringing a lawsuit under the FCRA,[11] it strikes the Court as even more demanding to require CRAs to delve into the issue of whether Mr. Myers' reaffirmation agreement with Ally was valid when it had no notice whatsoever from Mr. Myers that he disputed the reporting of the Ally account as discharged until he filed this lawsuit.  Ally confirmed that the debt had been discharged in bankruptcy, Mr. Myers had not disputed that position to the CRAs, and the CRAs had no reason to believe that Ally's information was inaccurate.  The FCRA does not require more of the CRAs under the circumstances presented in this case, and the Court finds that the CRAs were entitled to rely on the information from Ally regarding Mr. Myers' account such that they are not liable as a matter of law under § 1681e(b).

In sum, assuming without deciding that reporting Mr. Myers' Ally loan as discharged was inaccurate, the Court finds that the CRAs did not violate § 1681e(b) because discovering that the reporting was inaccurate would require a legal determination that the FCRA does not require the CRAs to make, and because the CRAs were entitled to rely upon information provided from Ally

---

[11] The Seventh Circuit has noted, however, that "a consumer disputing the legal validity of a debt that appears on her credit report should first attempt to resolve the matter directly with the creditor or furnisher, which stands in a far better position to make a thorough investigation of a disputed debt than the [consumer reporting agency] does on reinvestigation."  *Denan*, 959 F.3d at 297 (quotation and citation omitted).

that the loan had been discharged in bankruptcy.  The Court **GRANTS** the CRAs' Motion for Summary Judgment, [Filing No. 176], on Mr. Myers' § 1681e(b) claim.  However, the Court will go on to consider whether, even if the CRAs violated § 1681e(b), Mr. Myers has shown that the CRAs did so willfully.

### 4.    Whether the CRAs Willfully Violated § 1681e(b)

In support of their Motion for Summary Judgment, the CRAs argue that their procedures for reporting debts following a consumer's discharge from Chapter 7 bankruptcy are governed by the *White* Injunction, which provides that "when a furnisher reports that a consumer has discharged a debt in bankruptcy, the information supplied by the furnisher controls." [Filing No. 182 at 30.] They contend that they "perfectly followed the *White* Injunction in this case" because "[t]hey did not assume that [Mr. Myers] discharged his current-status Ally loan in bankruptcy and reported it as discharged in bankruptcy only because Ally instructed them to do so." [Filing No. 182 at 30.] The CRAs cite numerous cases which they contend hold that compliance with the *White* Injunction defeats a willfulness claim. [Filing No. 182 at 30.] The CRAs also reiterate their arguments that they accurately reported the information provided by Ally, and that they had no reason to doubt the accuracy of that information. [Filing No. 182 at 30-31.]

In response, Mr. Myers argues that willfulness is generally a question for the jury and that an Eastern District of California case, *Gadomski v. Equifax Info. Services, LLC*, 2020 WL 3841041 (E.D. Cal. July 8, 2020), has "put [the CRAs] on notice that failure to check public records violates the FCRA." [Filing No. 219 at 30.] Mr. Myers asserts that the following circumstances indicate that the CRAs' actions were willful: (1) the CRAs do not require their data furnishers to notify them when a debt is reaffirmed; and (2) the CRAs do not look for reaffirmation agreement information on the same docket that they use to obtain bankruptcy discharge information even

though the information is accessible to them and to the bankruptcy vendors through PACER. [Filing No. 219 at 31-32.]  Mr. Myers also argues that the *White* Injunction does not provide the CRAs with a defense to his willfulness claim because *White* "did not involve the failure to report publicly available bankruptcy information."  [Filing No. 219 at 34.]  Mr. Myers contends that "Ally's reliability as a furnisher is not the issue; rather, the issue is whether it was reasonable for [the CRAs] to also disregard the public bankruptcy records, especially when the two sources of information were in direct conflict."  [Filing No. 219 at 34-35.]

In reply, the CRAs note that *Gadomski* did not relate to reaffirmation agreements and was decided on the pleadings, without considering evidence that the furnisher consistently provided accurate post-bankruptcy information to the CRAs and evidence that the public records available in PACER were consistent with the CRAs' reporting.  [Filing No. 226 at 14.]  The CRAs argue that they each require furnishers to report accurate information and to use the Metro 2 reporting format and follow the CRRG, which "contains detailed instructions for reporting debts that have been reaffirmed."  [Filing No. 226 at 15.]  Finally, they argue that Mr. Myers "points to no authority suggesting that Section 1681e(b) requires the CRAs to instruct furnishers on how they must comply with their independent obligation to provide accurate information about a consumer's liability for a debt."  [Filing No. 226 at 15.]

Section 1681n of the FCRA provides that:

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of –

> (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000;

\*\*\*

> (2) such amount of punitive damages as the court may allow; and

36

> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. 1681n(a).  The Supreme Court has explained that the term "willfully" as used in § 1681n includes both knowing and reckless violations of the FCRA.  *Safeco Ins. Co. of America*, 551 U.S. at 56-60.  Specifically, it found that a CRA acts in reckless disregard of the FCRA when its action is "not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."  *Id.* at 69.  So, "only a reading that is 'objectively unreasonable' can be deemed a 'willful' violation."  *Van Straaten v. Shell Oil Prods. Co. LLC*, 678 F.3d 486, 489 (7th Cir. 2012) (quoting *Safeco Ins. Co. of America*, 551 U.S. at 69).

Mr. Myers' willfulness argument is based on the CRAs' reporting of some information from the bankruptcy docket, but its failure to report other information including the Ally reaffirmation agreement.  But even if this failure to inspect the bankruptcy docket and report the reaffirmation agreement was a violation of § 1681e(b) – and it is not – Mr. Myers has not shown that this failure was willful.  The *Gadomski* decision does not provide "notice" to the CRAs that they needed to dig into Mr. Myers' bankruptcy case to determine whether the reaffirmation agreement was valid, as Mr. Myers asserts.  There, the plaintiff alleged that a creditor had charged off an account before she filed for bankruptcy, and that the CRA reported the account as due and owing instead of discharged in bankruptcy.  *Gadomski*, 2020 WL 3841041, at *1.  The *Gadomski* court found that plaintiff's allegations that had the defendant checked PACER or LexisNexis, it would have seen the results of plaintiff's bankruptcy and updated her records was sufficient to allege a § 1681e(b) violation at the pleadings stage.  *Id.* at *5.  It denied the CRA's motion to dismiss, noting that it had to take plaintiff's allegations as true and draw all reasonable inferences in her favor.  *Id.*  The

*Gadomski* decision – which is not binding on this Court in any event – did not deal with a CRA's duty to determine the validity of a reaffirmation agreement and was decided at the pleadings stage, and the Court finds that it is not a basis for finding that the CRAs here willfully violated § 1681e(b).

Moreover, as discussed above, had the CRAs each reviewed Mr. Myers' bankruptcy docket on their own, they may not have reached the result that Mr. Myers hopes.  Reviewing the docket may have led the CRAs to reach the same conclusion as Ally, because such a review shows that the reaffirmation agreement was filed more than 60 days after the creditors' meeting, and does not show that the 60-day deadline was ever extended.  [*See* Filing No. 178-1.]

Additionally, the Court rejects Mr. Myers' argument that the CRAs did not require their furnishers to provide reaffirmation information.  The CRAs generally require their furnishers to provide accurate information and to comply with the CRRG, which instructs furnishers on how to report debts that have been reaffirmed.  [Filing No. 177-2 at 3-5; Filing No. 177-3 at 4-8; Filing No. 177-4 at 3-6; Filing No. 225-1 at 16; Filing No. 225-1 at 19.]  And the fact that Ally had a history of providing accurate information, and that the CRAs were not on notice of any issues with Ally's information, lead the Court to conclude that the CRAs did not act willfully.  Even assuming that the CRAs violated § 1681e(b), the Court finds that Mr. Myers has not presented sufficient evidence from which a reasonable jury could conclude that such a violation was willful and **GRANTS** the CRAs' Motion for Summary Judgment, [Filing No. 176], on that issue.

In sum, the Court **GRANTS** the CRAs' Motion for Summary Judgment, [Filing No. 176], to the extent it finds that Mr. Myers has not presented evidence from which a reasonable jury could conclude that the CRAs violated § 1681e(b) by reporting the Ally loan as discharged instead of reaffirmed or that, even if they had violated § 1681e(b), they did so willfully.  The CRAs' Motion

for Summary Judgment, [Filing No. 176], is **DENIED AS MOOT** as it relates to Mr. Myers' claim

for actual damages or any claim under § 1681o because Mr. Myers has abandoned any such claim.

## II.
### MR. MYERS' MOTION FOR CLASS CERTIFICATION

Mr. Myers seeks certification of the following class and sub-classes:

All consumers in the United States whose consumer reports inaccurately reported reaffirmed accounts as included or discharged in the consumer's bankruptcy and disclosed to a third party.

All consumers in the United States whose consumer reports inaccurately reported reaffirmed accounts as included or discharged in the consumer's bankruptcy when the information furnisher was reporting payments being made during and/or after the bankruptcy and disclosed to a third party.

All consumers in the United States whose consumer reports inaccurately reported reaffirmed accounts as included or discharged in the consumer's bankruptcy when the bankruptcy file shows Bankruptcy Form 427 and/or the reaffirmation agreement was filed and where this information was disclosed to a third party.

[Filing No. 164 at 9-10.] He argues that the class is readily ascertainable and that the requirements

of Fed. R. Civ. P. 23(a) – numerosity, commonality, typicality, and adequacy of representation –

and of Rule 23(b)(3) and (c)(4) are met. [Filing No. 164 at 19-32.]

The CRAs argue in response that Mr. Myers' class and sub-classes do not meet the

requirements of Rule 23(a)(1) or (b)(3), that Mr. Myers is subject to unique defenses that render

his claims atypical, and that the class and sub-classes are impermissible fail-safe classes, among

other things. [*See* Filing No. 183-1.]

Mr. Myers addresses the CRAs' arguments in his reply. [Filing No. 205.]

The Court can make short shrift of Mr. Myers' Motion for Class Certification. Because

Mr. Myers no longer has any viable individual claims against the CRAs, he is not an adequate

class representative. *Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001) ("[I]f the court

determines that the named plaintiffs' claims lack merit, such a decision 'ordinarily, though not

39

invariably,…disqualifies the named plaintiffs as proper class representatives,' thus resolving the issue of class certification.") (quoting *Cowen*, 70 F.3d at 941); *Roginson v. Sheriff of Cook Cnty.*, 167 F.3d 1155, 1157-58 (7th Cir. 1999) ("The point is not that a plaintiff is disqualified as class representative if he may fail to prove his case or if the defendant may have good defenses…. But if his claim is a clear loser at the time he asks to be made class representative, then approving him as class representative can only hurt the class.").

Additionally, the Court's decision on Mr. Myers' individual claims was highly fact-intensive, both on the issue of whether the CRAs violated § 1681e(b) and regarding whether any violation was willful. The individualized nature of the Court's inquiry renders Mr. Myers' class claims inappropriate for class treatment because individualized issues would predominate over any common issues. *See Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843-49 (7th Cir. 2022) (affirming district court's denial of motion for class certification where individualized issues predominated over common ones). For this reason and because Mr. Myers is not an adequate class representative, the Court **DENIES** Mr. Myers' Motion for Class Certification. [Filing No. 164.]

Because the Court is granting the CRAs' Motion for Summary Judgment on Mr. Myers' individual claims and denying his Motion for Class Certification, the Court **DISMISSES WITHOUT PREJUDICE** the putative class claims. *See Corrigan v. Domestic Linen Supply Co., Inc.*, 2012 WL 2977262, at *5 (N.D. Ill. July 20, 2012) (where named plaintiffs were required to arbitrate their claims and so could not represent a class, class claims were dismissed without prejudice); *Perry v. Martin*, 2013 WL 6331474, at *5 (E.D. Mo. Dec. 5, 2013) ("Because this Court is granting summary judgment in favor of the defendants on all of plaintiff's individual claims, there is no longer a plaintiff for purposes of seeking to proceed on the class action

allegations.  As a result, this Court will dismiss the class action claim.  The dismissal is without prejudice.").

### III.
#### CONCLUSION

For the foregoing reasons:

- The CRAs' Motion for Summary Judgment, [176], is **GRANTED** as to Mr. Myers' claim that the CRAs violated § 1681e(b) and that it did so willfully under § 1681n;

- Mr. Myers has abandoned any claim under § 1681n;

- The CRAs' Motion for Summary Judgment, [176], is **DENIED AS MOOT** as to Mr. Myers' claim for actual damages or any claim under § 1681o;

- Mr. Myers' Motion for Class Certification, [164], is **DENIED**; and

- The class claims are **DISMISSED WITHOUT PREJUDICE**.

Final judgment shall enter accordingly.

Date: 9/16/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**